# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Elizabeth A. Sampson and Tracey A. Lane, *et al.*,<br><br>       **Plaintiffs,**<br><br>v.<br><br>Fifth Third Bank,<br><br>       **Defendant.** | Case No.: 0:18-CV-01622 (PJS/DTS) |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT FIFTH THIRD BANK'S MOTION TO DISMISS

### SUMMARY OF ARGUMENT

Plaintiffs brought this putative class action alleging that Defendant Fifth Third Bank ("**Fifth Third**") wrongfully repossessed their car after Plaintiffs defaulted on their car loan and shortly after Sampson received a Chapter 7 bankruptcy discharge. Plaintiffs do not dispute the payment default, but instead argue the bank was not permitted to repossess the car until it provided them a notice that continued late payments were unacceptable. Plaintiffs argue that Fifth Third's failure to send the notice violated a rule created in *Cobb v. Midwest Recovery Bureau Co.*, 295 N.W.2d 232 (Minn. 1980),

and rendered the bank's repossession of the car a wrongful repossession and act of conversion under Minnesota law. (ECF No. 1-1, Compl. ¶¶ 37-43).

The Complaint must be dismissed for two independent reasons. First, a wrongful repossession action under *Cobb* is grounded on a theory of promissory estoppel—that by accepting multiple late payments, a creditor induces detrimental reliance by the debtor that late payments are acceptable and is therefore estopped from declaring a default due to a late payment. The "notice" is a way for a creditor to escape the effect of an estoppel created by *Cobb*; the failure to send a notice is not itself the basis for liability.

But Minnesota law no longer recognizes actions grounded in promissory estoppel that relate to contracts within the Minnesota Credit Agreement Statute, a statute of frauds provision (the "**MCAS**"). Passed in 1985, the MCAS requires that all modifications to credit agreements—including Plaintiffs' car loan—be in writing. Minn. Stat. § 513.33. In 2016, the Minnesota Supreme Court held that claims based on promissory estoppel were subject to the MCAS's writing requirement. *Figgins v. Wilcox*, 879 N.W.2d 653 (Minn. 2016). In the wake of the MCAS and *Figgins,* a *Cobb*-based wrongful repossession action is no longer viable in Minnesota, at least without a writing that satisfies the MCAS (which is not alleged here).

Second, Plaintiffs' action must be dismissed because Sampson's debt to Fifth Third under the car loan was discharged in her bankruptcy. Although

her Complaint alleges she reaffirmed the debt, her voluntary petition for bankruptcy and the docket from her corresponding bankruptcy proceedings conclusively establish no reaffirmation occurred. Under settled law, the discharge of a car loan in bankruptcy terminates any obligation to serve a "*Cobb* notice" before repossession occurs.

This Court should dismiss Plaintiffs' Complaint.

## INTRODUCTION

### A.  Factual Background.

In August 2014, Plaintiffs financed the purchase of a car with a loan from Fifth Third.  (Compl. ¶ 7.)  To secure the loan, Plaintiffs entered into a credit agreement with Fifth Third that granted the bank a security interest in Plaintiffs' car. (*Id.*) Specifically, on August 15, 2014, Plaintiff Elizabeth A. Sampson, as Borrower, and Plaintiff Tracey A. Lane, as Cosigner, entered into a certain Retail Installment Contract and Security Agreement (the "**Credit Agreement**"), held by Fifth Third, pertaining to a 2007 Lincoln MKZ automobile more fully described in the Credit Agreement.[1] (Declaration of Jessica Worthington, at Ex. 1).

---

[1] On a Rule 12(b)(6) motion, the Court may consider documents whose contents are alleged in a complaint and whose authenticity is undisputed but that are not physically attached to the pleading. *See Kushner v. Beverly Enters., Inc.,* 317 F.3d 820, 831 (8th Cir. 2003).

The Credit Agreement required that Plaintiffs make monthly payments to Fifth Third on the 29th day of each month. (*Id.*, Credit Agt. at 1.) The Credit Agreement further provided that a failure to meet their obligations is a default, and that:

> If you are in default on the Contract, we have all of the remedies provided by law and this Contract. Those remedies include:
>
> ***
>
> - We may immediately take possession of the Property by legal process, or self-help, but in doing so we may not breach the peace or unlawfully enter onto your premises;
>
> ***
>
> By choosing any one of these remedies, we do not give up our right to later use another remedy to the extent permitted by law. *By deciding not to use any remedy, we do not give up our right to consider the event a default of it happens again.*

(*Id.* at 2) (emphasis added). Finally, the Credit Agreement contains a no-modifications clause that provides:

> [O]ur entire agreement is contained in this Contract. There are no unwritten agreements regarding this Contract. *Any change to this Contract must be in writing and signed by you and us.*

(*Id.* at 1) (emphasis added).

About six months after entering into the Credit Agreement, Plaintiffs concede they began making untimely payments. (*See* Compl. at ¶ 9 (identifying February 2015 as the first late payment)). In March 2017, Sampson filed a

Chapter 7 voluntary petition for bankruptcy. (*Id.* ¶ 12.) The Bankruptcy Court entered a discharge order on May 31, 2017. (*Id.*)

After discharge, Plaintiffs missed the payment due for June 29, 2017 (*id.* ¶ 7-9, identifying June 2017 as a late payment), and made a late payment that Fifth Third allegedly "processed and accepted" on July 5. (*Id.* ¶ 22.) On July 6, 2017, at 4:30 a.m., the car was repossessed. (*Id.* ¶ 13.) The next day, Plaintiffs made payment to bring their account out of arrears—after Fifth Third waived the fees it paid the third-party repossession agent—and they redeemed the car. (*See id.* ¶¶ 19, 24-25.)

Now, Plaintiffs bring a putative class action against Fifth Third, alleging the bank improperly repossessed the car because it "repeatedly accepted" their "late and irregular payments" and did not send a "*Cobb* notice." (*Id.* ¶ 11.)

## B. <u>Procedural Background</u>

On or about May 11, 2018, Plaintiffs served Fifth Third with a summons and the Complaint that was venued, not but not filed, in the State of Minnesota, Second Judicial District Court. (ECF No. 1-1.) On June 11, 2018, Fifth Third removed Plaintiffs' action to this Court pursuant to 28 U.S.C. §§ 1332(d), 1441, 1446, and 1453, as amended by the Class Action Fairness Act of 2005. (ECF No. 1.)

# LAW AND ARGUMENT

## A.    Standard Of Review.

"[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Although the factual allegations in the complaint need not be detailed, they must be sufficient to 'raise a right to relief above the speculative level ....'" *Potocnik v. Carlson*, No. 13–CV–2093 (PJS/HB), 2014 WL 5363601, at *1 (D. Minn. Oct. 21, 2014) (quoting *Twombly*, 550 U.S. at 555).  In ruling on a motion to dismiss, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

This case raises questions about the interaction of Minnesota contract law, promissory estoppel, Article IX of Minnesota's enactment of the U.C.C., and the MCSA. Under *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 78 (1938), this Court, sitting in diversity, must apply substantive Minnesota law as determined by statute or a controlling decision of the Minnesota Supreme Court. The question of how the MCSA interacts with *Cobb* has not been resolved by a definitive pronouncement of the Minnesota Supreme Court.

Accordingly, this Court, in exercising diversity jurisdiction, should make an "*Erie* guess" and predict how the Minnesota Supreme Court would decide the question. *Blankenship v. USA Truck, Inc.,* 601 F.3d 852, 856 (8th Cir. 2010).[2] When making an "*Erie* guess," the Court should apply "the most recent decisions of" the Minnesota Supreme Court. *AMCO Ins. Co. v. Williams,* No. 6:15-cv-03425, 2016 WL 9105172, *1 (W.D. Mo. June 2, 2016), citing *Owens Ins. Co. v. Hughes*, 712 F.3d 392, 393 (8th Cir. 2013). *See also Western Fuel Oil*

---

[2] Alternatively, if this Court believes the question is too novel or unsettled to make a proper *Erie* guess, Fifth Third requests that the Court certify the issue to the Minnesota Supreme Court pursuant to Minn. Stat. § 480.065, subd. 3, as the issue is "determinative of an issue in pending litigation in the certifying court and there is no controlling appellate decision, constitutional provision, or statute of [the state of Minnesota]" to conclusively resolve the issue. *Friedlander v. Edwards Lifesciences, LLC*, No. 16-cv-1747, 2016 WL 7007489, *1 (D. Minn. Nov. 29, 2016). *See also Hatfield, by Hatfield v. Bishop Clarkson Meml. Hosp.*, 701 F.2d 1266, 1267 (8th Cir. 1983). While this Court has held that "certification is not appropriate when the parties merely want to try to persuade the Minnesota Supreme Court to change its mind about a clear and recent holding," *Land O' Lakes, Inc. v. Employers Mut. Liab. Ins. Co. of Wisc.*, 846 F.Supp.2d 1007, 1042 (D. Minn. 2012) (Schiltz, J.), certification is appropriate where subsequent decisions of a state supreme court create uncertainty as to the continuing application of older precedents. In *Doe No. 62 v. Delta Tau Delta Beta Alpha Chapter*, No. 1:16-cv-01480, 2018 WL 1858202 (S.D. Ind. Apr. 18, 2018), for instance, the court certified questions to the Indiana Supreme Court where two 2016 Indiana Supreme Court decisions created uncertainty as to whether the holding of a 1999 decision by the court remained the law of Indiana. *Id*. at *9. Likewise, certification would be appropriate where, as here, Minnesota's public policy regarding debtor-creditor relations is at issue. *Medill v. Halverson,* No. 4-90-876, 1991 WL 55928, *1 (D. Minn. Mar. 28, 1991) (certifying question to Minnesota Supreme Court where "[t]he question invokes substantial public policy concerns regarding debtor-creditor relations within the context of Minnesota constitutional and exemption law").

*Co. v. Kemp*, 245 F.2d 633, 642 (8th Cir. 1957). Here, for the reasons that follow, the Court should hold that Plaintiffs failed to state a claim because the MCAS and *Figgins* bar their action as a matter of law.

Additionally, this Court should dismiss Plaintiffs' claims because, as a matter of law, Sampson's bankruptcy discharge was a supervening event that terminated any alleged obligation of Fifth Third to serve a notice before repossessing the car.

**B.**  **Plaintiffs' Claims Sound In Promissory Estoppel And Must Be Dismissed Under The MCAS.**

Plaintiffs' claims hinge on their allegation that Fifth Third was required to send Plaintiffs a "*Cobb* notice" before it repossessed the car, because Fifth Third had accepted late payments from Plaintiffs in the past. (Compl. ¶¶ 38, 41). Plaintiffs contend that the alleged failure to send the notice resulted in the repossession of the car violating Minnesota Statutes section 336.9-609 and constituting an act of common law conversion.

Plaintiffs' theory is grounded on a fundamental misconception. Sending a *Cobb* notice is not required by the text of section 336.9-609 or any other Minnesota statute. It is instead a judicially created safe harbor—a step creditors can employ to avoid liability for promissory estoppel when they want to repossess collateral after having accepted multiple late payments. *Cobb v.*

*Midwest Recovery Bureau Co.*, 295 N.W.2d 232 (Minn. 1980). A *Cobb* wrongful

repossession action is grounded in estoppel. *Id.* at 236.

Developments in Minnesota law since the *Cobb* decision foreclose

estoppel-based actions like Plaintiffs'. The enactment of the MCAS in 1985,

and the body of Minnesota case law interpreting the MCAS—culminating in

*Figgins v. Wilcox*, 879 N.W.2d 653 (Minn. 2016)—create a categorical bar to

estoppel liability arising out of credit agreements like the one in this case.

Alleged oral statements or conduct of a lender can no longer create an estoppel

in Minnesota; only *writings*, signed by the parties, can alter the parties'

contractual obligations.[3] Here, since Plaintiffs allege no such writing, no viable

promissory estoppel claim exists. The Complaint should therefore be dismissed

with prejudice.

> 1.    Plaintiffs' claims are grounded in *Cobb*, which recognized
>       promissory estoppel claims arising out of late payments.

*Cobb* was a wrongful repossession action brought by the owner of a semi-

truck. After a lengthy history of accepting late payments, the secured party

---

[3] The broad application of Minn. Stat. § 513.33 necessarily applies to all actions. *See BankCherokee v. Insignia Dev., LLC*, 779 N.W.2d 896, 903 (Minn. Ct. App. 2010) ("Any party asserting the existence of a 'credit agreement' must comply with the writing and signature requirements of section 513.33, regardless of the type of claim the agreement is alleged to support."), *rev. denied* (Minn. May 18, 2010); *Bracewell v. U.S. Bank Nat. Ass'n.*, Civ. No. 12-2501 (RHK/JSM), 2012 WL 6634789, *3 (D. Minn. Dec. 20, 2012) ("[Section 513.33] prohibits any 'action' based on a credit agreement, not just certain kinds of claims."), *aff'd*, 748 F.3d 793 (8th Cir. 2014).

suddenly reversed course and repossessed the truck without notice—at a time when only four payments remained due on the contract. *Id.* at 234. The Minnesota Supreme Court concluded that by accepting the debtor's "continued pattern of irregular and late payments," the secured party was "estopped from asserting his contract rights because his conduct had induced the justified reliance of the debtor in believing that late payments were acceptable." *Id.* at 236. Although *Cobb* cited Minnesota Statute section 336.9-509 (1978), now codified as section 336.9-609 (2018), the basis for liability was grounded in promissory estoppel: the secured party violated section 336.9-609 because its conduct estopped it from treating the agreement as in default, and section 336.9-609 requires a default before taking repossession of the collateral. *Id.,* quoting *Nevada Nat'l Bank v. Huff*, 582 P.2d 364, 369 (Nev. 1978).[4] *See also, e.g., Rodgers v. General Elec. Capital Corp.*, 596 N.W.2d 671, 673 (Minn. Ct. App. 1999) ("The rationale for the notice requirement in *Cobb* is that the secured party's conduct in accepting repeated late payments induces the debtor's justified reliance in the acceptability of late payments."); *Swift County Bank v. United Farmers Elevators*, 366 N.W.2d 606, 609 (Minn. Ct. App. 1985) ("*Cobb* was decided on a theory of detrimental reliance."); *accord*

---

[4] Minn. Stat. § 336.9-609(a) provides: "After *default*, a secured party: (1) may take possession of the collateral...." (emphasis supplied). Here, it is undisputed that non-payment is a default under the Credit Agreement.

*Winthrop Res. Corp. v. Cambridge Research Assocs., Inc.*, No. A03-400, 2003 WL 22846113, *4 (Minn. Ct. App. Dec. 2, 2003).

The court recognized that the acceptance of late payments by a secured party did not result in an "outright waiver" or forfeiture of a secured party's right to "rely upon a clause in the agreement authorizing him to declare a default and repossess the chattel" if payment is not timely made. *Id.* at 236, quoting *Huff*, 582 P.2d at 369. The *Cobb* court then held that, once a secured party is estopped from declaring a default and exercising post-default remedies, it may escape the effect of its estoppel by "giv[ing] notice to the debtor (lessee) that strict compliance with the terms of the contract will be demanded henceforth if repossession is to be avoided." *Id.*, quoting *Huff,* 582 P.2d at 369. The court explained that its judicially crafted notice—what Plaintiffs term the "*Cobb* notice"—serves as a safe harbor for creditors against estoppel liability for accepting late payments:

> The creditor is protected because, by the device of one letter, the creditor can totally preserve its remedies so that if the account continues in default, repossession could be pursued as provided in the contract without further demand or notice.

*Id.* at 237. Thus, properly understood, a claim for wrongful repossession under *Cobb* is not founded on a failure to send a notice—it is instead a species of promissory estoppel claim.

2.     The MCAS, enacted post-*Cobb*, bars actions grounded on alleged modifications to credit agreements that are not in writing and signed by the creditor.

In 1985, the Minnesota Legislature enacted the MCAS, codified at Minnesota Statutes section 513.33. The MCAS, a statute of frauds, provides that "a debtor may not maintain an action on a credit agreement unless the agreement is in writing, expresses consideration, sets forth the relevant terms and conditions, and is signed by the creditor and debtor." *Id*. at subd. 2.

This statute was enacted in response to the "farm crisis of the 1980s," which "produced cash-strapped and financially unsophisticated farmers who claimed reliance upon their bank officers' oral promises to renew their loans." *Rural Am. Bank of Greenwald v. Herickhoff*, 485 N.W.2d 702, 705 (Minn. 1992). The MCAS "prevent[s] the litigation of such difficult claims." *Id*. Legislatures across the country enacted similar statutes of frauds provisions following the savings and loan crisis to stave off waves of similarly difficult litigation. *See, e.g.*, *Fleming Irrigation, Inc. v. Pioneer Bank & Trust Co.*, 661 So.2d 1035, 1037-1038 (La. App. 1995); *Hewitt v. Pitkin County Bank & Trust Co.*, 931 P.2d 456, 458-459 (Colo. App. 1995); *Dixon v. Countrywide Home Loans, Inc.*, 710 F.Supp.2d 1325, 1330 (S.D. Fla. 2010); *LaSalle Bank, N.A. v. Paramont Props.*, 588 F.Supp.2d 840, 853-854 (N.D. Ill. 2008).

"The statute accomplishes its goal by creating a requirement that certain 'credit agreements' be in writing." *Figgins*, 879 N.W.2d at 656. The statute

defines "credit agreement" as any "agreement to lend or forbear repayment of money, goods, or things in action, to otherwise extend credit, or to make any other financial accommodation." Minn. Stat. § 513.33, subd. 1(1). "[T]he word 'agreement' in section 513.33 has a broader meaning than a fully consummated and legally binding contract." *Figgins*, 879 N.W.2d at 657. Indeed, the Legislature used the word "agreement" rather than "contract" because it "intended the statute to address a broader set of interactions than those qualifying as enforceable contracts." *Id.*

Minnesota courts construe the MCAS's broad language as barring actions based on alleged modifications to a credit agreement that do not satisfy the writing requirement. *See, e.g., Tharaldson v. Ocwen Loan Servicing, LLC*, 840 F. Supp.2d1156, 1162–63 (D. Minn. 2011) ("A loan modification constitutes a credit agreement"), citing *Myrlie v. Countrywide Bank*, 775 F.Supp.2d 1100, 1108–09 (D. Minn. 2011). *See also BankCherokee*, 779 N.W.2d at 902 (discussing "the statute's broad application"); *accord Brisbin v. Aurora Loan Servs., LLC*, 679 F.3d 748, 753 (8th Cir. 2012) (claim founded on an unwritten "forbearance" agreement—one to "refrain[] from enforcing a right, obligation, or debt"—was barred by section 513.33). In particular, the MCAS bars actions based on credit agreements allegedly created by a past course of dealings— which is the foundation of Plaintiffs' claims here. *See, e.g., Benson v. Wells Fargo Bank, N.A.,* No. 12-1213, 2013 WL 4521173, *2 (D. Minn. Aug. 27, 2013)

(holding that the MCAS barred claim that bank's course of dealings modified provision in promissory note); *Fronning v. Blume*, 429 N.W.2d 310, 314 (Minn. Ct. App. 1988) ("The statute prohibits finding a credit agreement was created through the parties past dealings."); *Calhoun Beach Assocs. v. Citicorp Real Estate, Inc.*, No. C7-92-2060, 1993 WL 71498, *2 (Minn. Ct. App. Mar. 16, 1993) (holding "the existence of a credit agreement cannot be implied from the parties' past dealings" and observing that permitting such a claim would "defeat the statutory purpose of precluding litigation of hard-to-prove credit agreements"); *Toss v. Homeward Residential, Inc.*, No. 13-1887 (DSD/SER), 2014 WL 813883, *2 (D. Minn. Mar. 3, 2014) (finding written forbearance agreement unenforceable under the MCAS, even though lender accepted multiple payments under it, because borrower did not sign as the statute required).

3.     In *Figgins*, the Minnesota Supreme Court foreclosed exceptions to MCAS, including promissory estoppel claims.

On June 1, 2016, the Minnesota Supreme Court held in *Figgins* that a litigant cannot use a promissory estoppel claim to circumvent the MCAS, clarifying what had been a split of authority in the Minnesota courts on this question. 879 N.W.2d at 659. Minnesota law is now clear that claims based in promissory estoppel are barred by the MCAS when the subject of the estoppel is a credit agreement within the ambit of the statute.

In *Figgins*, a borrower asserted claims, including one for promissory estoppel, against a bank arising out of allegations that the bank president told the borrower he did not have to make a balloon payment on a commercial loan whilst the parties negotiated refinancing. *Id.* at 654-655. The borrower argued that the MCAS did not bar his promissory estoppel claim, reasoning that "promissory estoppel acts as an exception to section 513.33," *id.* at 658, a conclusion reached in a Minnesota Court of Appeals decision, *Norwest Bank Minnesota, N.A. v. Midwestern Machinery Co.*, 481 N.W.2d 875 (Minn. Ct. App. 1992). The court rejected the borrower's argument, holding that "appellant's promissory estoppel claim does not survive the application of section 513.33" and was properly dismissed with prejudice. *Figgins*, 879 N.W.2d. at 659.

In doing so, the court found that there was "no textual basis for creating an exception to section 513.33 for promissory estoppel claims" because "[s]ection 513.33 does not, in any way, indicate that claims based on promissory estoppel are exempt from its provisions." *Id. Figgins* further held that a promissory estoppel exception was incompatible with the statute's purpose: "A judicially crafted exception to section 513.33 that allows for promissory estoppel claims would substantially undermine the purpose of the statute and would be inconsistent with both the letter and the spirit of the law." *Id.* at 659. The court accordingly concluded: "the text of section 513.33 is plain, clear, and

unambiguous—no action on a credit agreement may be maintained unless the writing requirement is satisfied." *Id.*

*Figgins* accordingly resolved the uncertainty in Minnesota law on the viability of actions based on promissory estoppel that are subject to the MCAS. A majority of antecedent case law had supported the view that promissory estoppel claims were not exempt. *See, e.g., Brisbin*, 679 F.3d at 753 ("[W]e conclude that the MCAS prohibits the enforcement of an oral promise to postpone a foreclosure sale and that the lender was entitled to summary judgment on Brisbin's promissory estoppel claim."); *St. Jude Medical S.C. v. Tormey*, 779 F.3d 894, 901 (8th Cir. 2015) ("Under Minnesota law, oral promises which constitute a credit agreement within the ambit of § 513.33 cannot be enforced under a theory of promissory estoppel; the promises must be in writing.") (collecting cases); *Tharaldson v. Ocwen Loan Servicing, LLC*, 840 F.Supp.2d 1156, 1162–63 (D. Minn. 2011); *Myrlie v. Countrywide Bank*, 775 F.Supp.2d 1100, 1106 (D. Minn. 2011). While *Norwest Bank* had allowed promissory estoppel claims to survive the MCAS and created uncertainty about Minnesota law, *Figgins* overruled *Norwest Bank* and brought needed clarity to the MCAS's scope. 879 N.W.2d at 659.

Minnesota law is now clear that "claims based on promissory estoppel" are *not* exempt from the MCAS, and that such claims are barred by the MCAS unless the statute's requirements are satisfied. *Id.*

4.   The MCAS bars Plaintiffs' action as a matter of law.

The passage of the MCAS, and *Figgins*' application of the MCAS to actions based on promissory estoppel, changed the legal landscape since *Cobb* was decided, and abrogated the estoppel-based theory on which it was built. As set forth above, the core of any wrongful repossession or conversion claim under *Cobb* is that the secured party's acceptance of multiple late payments ostensibly estopped the secured party from claiming future late payments are a default by inducing the debtor to believe late payments are acceptable. *Cobb,* in effect, was supposed to effect a modification to the parties' agreement.

In this case, for example, the Credit Agreement affirmatively requires payments be made by the 29th of each month, (Compl. at ¶ 7), provides that any non-compliance is an event of default (Credit Agt. at 2), and provides that repossession without notice is a remedy Fifth Third may employ in the event of default. (*Id.*). The Credit Agreement further provides that any changes to the Credit Agreement must be in writing and signed by both parties (*id.* at 1) and provides a non-waiver provision as follows:

> By choosing any one or more of these remedies, we do not give up our right to later use another remedy to the extent permitted by law. By deciding not to use any remedy, we do not give up our right to consider the event a default if it happens again.

(*Id.* at 2). *Cobb* used estoppel to amend these requirements—*i.e.*, the creditor's past forbearance created an unwritten amendment to a credit agreement based

on the borrower's detrimental reliance on the creditor's forbearance continuing.

*Cobb's* underlying theory is no longer viable in Minnesota post-*Figgins*, absent a writing capturing the facts giving rise to the estoppel, signed by both parties, expressing consideration, and setting forth the relevant terms and conditions. Recognizing a promissory estoppel-based claim for auto repossessions would amount to a prohibited "judicially crafted exception to section 513.33" that "substantially undermine[s] the purpose of the statute and would be inconsistent with both the letter and the spirit of the law." *Figgins*, 879 N.W.2d at 659. The plain language of the MCAS does not support such an exception, any more than the exception the debtor sought to recognize in *Figgins*. And, while this is a consumer transaction, that is a distinction without a difference as the statute does not provide different treatment to different types of credit transactions. *Accord Superior Shores Lakehome Ass'n v. Jensen-Re Partners,* 792 N.W.2d 865, 869 (Minn. Ct. App. 2011) ("a court of equity will not disregard statutory law or grant relief prohibited thereby") (collecting cases); *Reiter v. Kiffmeyer*, 721 N.W.2d 908, 911 (Minn. 2006) ("[W]e will not read into a statute a provision that the legislature has omitted, either purposely or inadvertently").

In the end, Plaintiffs' sole theory of liability is that Fifth Third accepted multiple late payments and then, after having done so, exercised its rights

under the Credit Agreement on July 6, 2017 to repossess the car due to continued late payments. (Compl. ¶ 7-13). Under the unambiguous language of the Credit Agreement, Fifth Third had the contractual right to declare a default and exercise its rights and remedies. The bank accordingly complied with Minnesota Statute section 336.9-609 (as Fifth Third exercised its right to repossess after default), and Fifth Third did not commit an unlawful repossession or a conversion of the car. To the extent *Cobb* is read to recognize an estoppel-based claim, it can only survive if there is a writing evidencing the estoppel that complies with the MCAS. Since no such writing is alleged or exists here, Plaintiffs' claims fail.

Finally, application of the MCAS to bar Plaintiffs' action is also consistent with Minnesota public policy. As the court found in *Langford Tool & Drill Co. v. 401 Grp., LLC*, A11-1166, 2012 WL 896418 (Minn. Ct. App. Mar. 19, 2012), penalizing lenders for cooperating with their borrowers is harmful:

> A nonwaiver clause in a lending agreement allows the lender to forebear small or temporary defects in the borrower's performance without waiving its right to terminate the agreement when and if it becomes apparent that the borrower cannot or will not cure the defects. Were we to declare all such nonwaiver clauses ineffective, a lender would be forced to choose between enforcing each and every right under a lending agreement—which may lead to harsh results for the borrower and effectively make it impossible for the borrower to repay the loan—or suffer the borrower's breaches of the lending agreement indefinitely. Such a result could harm both lenders and borrowers.

*Id.* at *5. The same logic applies to *Cobb* notices. Borrowers benefit when lenders forbear a few late payments instead of exercising the harshest remedy under the contract—repossession. Plaintiffs, of the mind that no good deed should go unpunished, seek to penalize a lender that does so by forbidding that lender from exercising its right to repossess until it sends a *Cobb* notice. A lender faced with that choice may respond by sending *Cobb* notices after each late payment to ensure its rights are not impaired, defeating the purported purpose of a *Cobb* notice,[5] or might immediately repossess after the first late payment. This regime creates perverse incentives for lenders to *not* work with their borrowers, but to instead treat them more harshly. Hindering collegial lender-borrower relationships cannot be Minnesota's public policy.

C.     **_Cobb's_ Failure To Enforce An Anti-Waiver Provision In A Credit Agreement Is Also Inconsistent With The MCAS.**

*Cobb* is also increasingly an outlier in Minnesota law due to its failure to enforce (or even address) anti-waiver and non-modification provisions in the parties' agreement. *See* 295 N.W.2d at 233; Credit Agt. at 1-2. *Cobb* has been criticized by other state supreme courts for this reason. *See, e.g., Van Bibber*

---

[5] The *Cobb* notice is intended to warn the borrower that future late payments are unacceptable. In *Cobb*, the borrower made many late payments. Sending a notice after each late payment would satisfy *Cobb*, 295 N.W.2d at 237, but could create a situation where a borrower could argue the bank lulled the borrower by accepting late payments after sending *Cobb* notices, but not repossessing until (perhaps) an inconvenient time for the borrower.

*v. Norris*, 419 N.E.2d 115 (Ind. 1981) ("We note that [*Cobb*] is not a sound decision, since it begs the question of validity of the non-waiver clause. The cases it cites all stand for the general proposition that notice is a prerequisite to exercise of the right to repossess after continual acceptance of late payments. *None of the cases cited in Cobb involved a non-waiver clause.*") (emphasis added); *Minor v. Chase Auto Fin. Corp.*, 372 S.W.3d 762, 768 (Ark. 2010) ("[A] rule providing that nonwaiver clauses could themselves be waived by the acceptance of late payments is illogical, since the very conduct which the non-waiver clause is designed to permit, acceptance of late payment, is turned around to constitute waiver of the clause permitting the conduct.'") (quotations and citations omitted).

Here, the Credit Agreement provides that: (1) "[a]ny change to this Contract must be in writing and signed by you and us," and (2) "[b]y deciding not to use any remedy, we do not give up our right to consider the event a default if it happens again." (Credit Agt. at 1-2.) The Minnesota Court of Appeals has held that a non-waiver clause is enforceable under the MCAS. *Langford Tool & Drill Co.*, 2012 WL 896418, at *5 (enforcement of a "nonwaiver clause not only comports with section 513.33, but promotes sound public policy."). And a judge of this Court has held that an anti-waiver provision in a mortgage barred a claim that the bank waived an event of default by accepting partial payments post-default. *Armas v. Fifth Third Bancorp*, No. 17-3820

(DSD/KMM), 2018 WL 2426640, at *2-3 (D. Minn. May 30, 2018). Such an outcome is consistent with long-standing Minnesota principles of freedom of contract, *see Hart v. Bell*, 23 N.W.2d 375, 379 (Minn. 1946); *Telex Corp. v. Data Products Corp.*, 135 N.W.2d 681, 687 (Minn. 1965), and with parties' rights to contractually vary statutory rights and obligations under the U.C.C. *See* Minn. Stat. § 336.1-302(a) (providing that "the effect of provisions of the Uniform Commercial Code may be varied by agreement"); Minn. Stat. § 336.9-201(a); Minn. Stat. § 336.9-602(6).

As Plaintiffs intend to apply it, *Cobb* impairs contact rights that belong to Fifth Third. Under the MCAS, however, the anti-waiver and non-modification clauses in the Credit Agreement are enforceable unless waived or modified in a writing that satisfies the MCAS's requirements. Because the law strongly disfavors forfeiture (*see Anacapa Tech. v. ADC Telecomm.*, 241 F.Supp.2d 1016, 1021 (D. Minn. 2002)), it is appropriate now to give the terms of the parties' contract full meaning, and look beyond *Cobb* based on the intervening enactment of the MCAS and *Figgins*.

**D.** **Plaintiffs' Action Must Also Be Dismissed Because Sampson's Chapter 7 Bankruptcy Discharge Vitiates Plaintiffs' Claims.**

Plaintiffs' action must also be dismissed because Sampson's payment obligations to Fifth Third under the Credit Agreement were discharged in her Chapter 7 bankruptcy. As a result, there can be no corresponding obligation to

provide a "*Cobb* notice" because, with the Credit Agreement discharged, any reliance by Plaintiffs on Fifth Third accepting continued late payments was extinguished.

1.     Sampson did not reaffirm the Credit Agreement in her bankruptcy.

The Complaint contains allegations concerning Sampson's Chapter 7 bankruptcy. (Compl. ¶¶ 12, 21). She acknowledges filing a Chapter 7 bankruptcy and obtaining a discharge on May 31, 2017. (*Id.* at ¶ 12). While she claims to have reaffirmed the debt to Fifth Third, and claims the Credit Agreement was not discharged, this is demonstrably false.

To reaffirm a debt in Chapter 7 so it is not discharged, a reaffirmation agreement must "be filed no later than 60 days after the first date set for the meeting of creditors under §341(a) of the Code." Fed. R. Bankr. P. 4008(a). The Bankruptcy Code also provides that a reaffirmation agreement is enforceable "only if ... such agreement was made before the granting of the discharge." 11 U.S.C. § 524(c)(1). Further, a reaffirmation agreement is *only* enforceable after the bankruptcy court holds a hearing under 11 U.S.C. §§ 524(c) and (d). *In re Kirby*, 209 B.R. 128, 131 (Bankr. D. Minn. 1997), *as amended* (June 6, 1997) ("The reaffirmation agreement executed by the Defendants is not enforceable because the Defendants did not attend the reaffirmation hearing as required by § 524(c) and (d) of the Bankruptcy Code.").

Sampson filed a voluntary petition for chapter 7 bankruptcy on March 2, 2017 (the "Petition"). (*See* Declaration of C.J. Schoenwetter, at Ex. 2).[6] Sampson's Petition does *not* indicate her intent to reaffirm her debt to Fifth Third under the Credit Agreement. Instead, she opted to "retain and pay:"

| Part 1: | List Your Creditors Who Have Secured Claims | | |
|---|---|---|---|
| 1. For any creditors that you listed in Part 1 of Schedule D: Creditors Who Have Claims Secured by Property (Official Form 106D), fill in the information below. | | | |
| | Identify the creditor and the property that is collateral | What do you intend to do with the property that secures a debt? | Did you claim the property as exempt on Schedule C? |
| Creditor's name: | FIFTH THIRD BANK | ☐ Surrender the property. | ☐ No |
| | | ☐ Retain the property and redeem it. | ■ Yes |
| Description of property securing debt: | 2007 Lincoln MKZ 135,000 miles fair condition (I have a 1/2 joint interest with my sister) | ☐ Retain the property and enter into a Reaffirmation Agreement. | |
| | | ■ Retain the property and [explain]: retain and pay | |

---

6 The district court can take judicial notice of Sampson's Petition and the bankruptcy court's docket without converting this motion to one for summary judgment. *See, e.g.*, *Woodards v. Chipotle Mexican Grill, Inc.*, 2015 WL 3447438, at *8 (D. Minn. May 28, 2015); *Zimmerman v. Bellows*, 988 F.Supp.2d 1026, 1029 n.1 (D. Minn. 2013) ("The Court takes judicial notice of the docket[.]") (citing Fed. R. Evid. 201(b)); *In re Moffitt*, 408 B.R. 249, 252 n.2 (Bankr. E.D. Ark. 2009) (taking judicial notice of a debtor's bankruptcy case docket). These materials are undisputable public records that are the proper subject of judicial notice and can be considered on a Rule 12(b)(6) motion. *See Stahl v. U.S. Dep't of Agric.*, 327 F.3d 697, 700 (8th Cir. 2003). The court can also take notice of absences from the docket. *See, e.g., In re Living Hope S.W. Med. SVCS, LLC*, 450 B.R. 139, 148 (Bankr. W.D. Ark. 2011), *aff'd sub nom,* 4:06-BK-71484, 2012 WL 1078345 (W.D. Ark. Mar. 30, 2012), aff'd, 509 Fed. Appx. 578 (8th Cir. 2013) (taking judicial notice "that the case docket reflects that the Debtor did not file a motion to obtain credit from Pillar, and parties in interest did not have an opportunity for hearing prior to the transfer of funds from Pillar to the Debtor."); *Nettles v. Jett*, 2016 WL 8732184, at *5 (S.D. Ala. Mar. 11, 2016), report and recommendation adopted, 2016 WL 1369417 (S.D. Ala. Apr. 4, 2016); *In re Trichilo*, 540 B.R. 547, 550 (Bankr. M.D. Pa. 2015; *cf. In re Horras*, 399 B.R. 885, 887 (Bankr. S.D. Iowa 2009).

(*Id.* at 43). As the bankruptcy court's docket in Sampson's case reveals, (*see* Schoenwetter Decl. at Ex. 1), no reaffirmation agreement was filed on the bankruptcy court's docket in her Chapter 7 case at any time, and certainly not prior to the issuance of her Chapter 7 discharge on May 31, 2017. (Schoenwetter Decl. at Ex. 3.)

A debtor has at least three options concerning the disposition of property subject to a secured claim in Chapter 7. The debtor may: (1) surrender the property; (2) retain the property and redeem it; or (3) retain the property and enter into a reaffirmation agreement with the creditor. In some circuits, debtors can also opt for an unofficial fourth option called "retain and pay," a/k/a "ride-through," under which the debtor would retain the property and continue making payments despite not entering into a reaffirmation agreement. *See In re Gregory*, 572 B.R. 220, 229 (Bankr. W.D. Mo. 2017).[7]

> Under this [retain and pay] option, the debtor—having extinguished any personal liability on the loan with his discharge—could continue to drive the car or live in the house while he was current. But if the debtor later decided to give up the car, for example, the lender was limited to repossessing the depreciated vehicle; *the discharge injunction prevented the lender from suing the debtor to recover any deficiency.*

---

[7] In *Gregory*, the court presents an historical overview of these options. *Id.* at 228-32. "The courts were violently split on the issue of ride-through, resulting in "retain and pay" and "no-retain-and-pay camps." *Id.* at 229-30, n. 37-38. Congress attempted to eliminate the use of retain and pay when it enacted the Bankruptcy Abuse Prevention and Consumer Protection Act in 2005. *Id.* at 230.

*Id.*, emphasis added.

By selecting the "retain and pay" option instead of entering into a reaffirmation agreement, Sampson did not, as a matter of law, reaffirm her debt to Fifth Third. Accordingly, the May 31, 2017 bankruptcy discharge included the debt at the heart of this action. *See* 11 U.S.C. § 727(b) ("a discharge under subsection (a) of this section discharges the debtor from all debts that arose before the date of the order for relief under this chapter.").

2.  Sampson's discharge terminated any obligation Fifth Third may have had to provide a *Cobb* notice prior to repossession.

The discharge of Sampson's personal liability under the Credit Agreement in bankruptcy terminated any duty Fifth Third may have had to provide a "*Cobb* notice." *See* 6 Minn. Prac., Methods of Practice § 27.21 (3d ed. 2017 update) ("A creditor who has a valid security interest in a vehicle may repossess the vehicle without notice to the debtor, where the underlying debt, an installment contract, has been discharged in bankruptcy, and the debtor has not reaffirmed the installment contract."), citing *Rodgers v. General Elec. Capital Corp.*, 596 N.W.2d 671 (Minn. Ct. App. 1999).

In *Rodgers*, the creditor repossessed a vehicle under the terms of a security agreement after debtor received a discharge in bankruptcy. 596 N.W.2d at 672. The debtor argued that despite her discharge and her failure to reaffirm the installment contract post-bankruptcy, the creditor was still

required under *Cobb* to notify her it would no longer accept late payments on the installment contract before repossessing the vehicle. *Id.* at 673.

The Court of Appeals disagreed. It held that in the absence of a valid reaffirmation agreement, no installment contract survived the bankruptcy discharge and debtor was not entitled to notice pursuant to *Cobb* before repossession. *Id.* at 673. The court also found debtor had "not shown any justifiable reliance that would estop [creditor] from asserting its security interest in the vehicle" because "[w]ith the discharge of the installment contract in bankruptcy, any reliance or expectation on [debtor's] part that late payments could continue was extinguished." *Id.*

As in *Rodgers*, Sampson's debt was discharged in bankruptcy and it would be nonsensical to require Fifth Third provide notice it would demand strict compliance with a contract that no longer existed. Indeed, requiring a creditor to issue a *Cobb* notice post-discharge would potentially expose that creditor to liability for violating the discharge injunction. *See* 11 U.S.C. § 524 (a)(2) ("A discharge in a case under this title ... operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor[.]") Indeed, just as a creditor is prevented from suing a debtor to recover on a discharged debt, *see In re Gregory*, 572 B.R. at 229, that

same creditor also cannot provide a notice demanding strict compliance with a contract and to pay a debt that have both been discharged through bankruptcy.

Further, even if the Court were to find *Cobb* generally applicable, Plaintiffs' claims still fail because Plaintiffs allege Fifth Third Bank only accepted one late payment after the May 31, 2017 bankruptcy discharge. (*See* Compl. at ¶ 9, "[o]ver the course of Plaintiffs' loan with FTB, Plaintiff Sampson made, and FTB accepted, a number of late or irregular payments to it, including late payments for the installments that were due for the months of February 2015, May 2016, September 2016, December 2016, February 2017, March 2017, April 2017, May 2017, and *June 2017*.") (emphasis added). Accordingly, after Sampson's election to "retain and pay" and her discharge in bankruptcy, she only made one late payment prior to repossession of the car. This does not trigger any alleged requirement to provide a *Cobb* notice.

## CONCLUSION

For the foregoing reasons, the Court should dismiss Plaintiffs' Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

Dated:  July 12, 2018.

Respectfully submitted,

**BOWMAN AND BROOKE LLP**

*/s/ Charles (C.J.) Schoenwetter*
Charles (C.J.) Schoenwetter (#025115X)
David J. Carrier (#393582)
150 South Fifth Street, Suite 3000
Minneapolis, MN  55402
Tel: (612) 339-8682
Fax: (612) 672-3200
cj.schoenwetter@bowmanandbrooke.com
david.carrier@bowmanandbrooke.com

and

**BAKERHOSTETLER LLP**

Patrick T. Lewis (OH #0078314)*
Key Tower
127 Public Square, Suite 2000
Cleveland, OH 44114-1214
Tel: (216) 621-0200
Fax: (216) 696-0740
plewis@bakerlaw.com
*pro hac vice pending*

*Attorneys for Defendant Fifth Third Bank*